[No. D030209. Fourth Dist., Div. One. Apr. 27, 1999.]

THE PEOPLE, Plaintiff and Respondent, v.
LARRY ULYSEUSS VORISE, Defendant and Appellant.

314

## COUNSEL

Roberta K. Thyfault, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren and Bill Lockyer, Attorneys General, George Williamson and David P. Druliner, Chief Assistant Attorneys General, Gary W. Schons, Assistant Attorney General, Warren P. Robinson and Randall D. Einhorn, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**KREMER, P. J.**—Larry Ulyseuss Vorise appeals his conviction of first degree murder committed by personally using a firearm (Pen. Code,[1] §§ 187, subd. (a), 12022.5, subd. (a)(1)) and with the special circumstance that he committed the murder for the purpose of avoiding or preventing a lawful arrest (§ 190.2, subd. (a)(5)). On appeal, he contends the evidence is insufficient to support a finding of premeditation and deliberation or to support the special circumstance. He also contends the court improperly refused his request to modify the special circumstance instruction. We affirm.

### FACTS

In early November 1996, Carol Edgerton's distinctive yellow bicycle was stolen. About a month later, on the evening of December 8, 1996, as Carol and her husband Jay Edgerton[2] were parking their car near their apartment, they saw Vorise riding Carol's bicycle toward an apartment building across the street. Jay followed Vorise into the apartment building foyer while Carol, at Jay's request, retrieved some pepper spray.

When Carol entered the foyer about 30 seconds later, Jay and Vorise were in the foyer facing each other, with Vorise straddling the bicycle. She walked up to the back of the bicycle, examined it and said, "This is my bike." Jay moved slightly forward, put both hands on the bicycle's handlebars, straddled the front tire of the bicycle and asked Vorise, "Where did you get the bike?" Vorise answered, "I don't know, man; I got it from someone off the street." Both Jay and Vorise were calm.

Carol said, "I'm going to call the cops and we will get this straightened out" and started to turn away. Before she had completely turned away, Vorise said, "Oh, no, you aren't," reached inside his jacket and pulled out a gun.[3] Jay grabbed the gun and he and Vorise briefly struggled. The gun fired. Jay and Vorise continued to struggle over the gun. The gun fired a second time. Jay let go of the gun, had a bewildered look on his face and started slumping to the ground. Vorise, "[c]alm," "[c]ool," and "[f]ocused," bent over Jay and fired twice "[s]traight into [Jay's] chest."

Vorise straightened up and turned toward Carol. She remembered the pepper spray and tried to spray him in the face but he blocked the spray with

---

[1]All statutory references are to the Penal Code unless otherwise specified.

[2]Hereafter, for the sake of clarity we use the first names of the Edgertons. We intend no disrespect.

[3]Carol did not immediately realize Vorise had pulled out a gun; she initially saw that Vorise had something "silver" in his hand and only after it fired did she realize it was a gun.

his hands. Afraid that he would hit her with the gun, Carol backed off a little bit and then as Vorise was trying to get off the bicycle which had become entangled in Jay's legs, Carol sprayed Vorise at close range. Vorise stumbled over the bicycle, went out the door and ran down the street.

Jay died as a result of multiple gunshot wounds. He suffered three bullet wounds.[4] One bullet entered his right shoulder area, went through his rib cage, right lung, aorta, left lung and diaphragm. The bullet traveled from right to left and downward at an angle of 20 to 25 degrees. There was stippling[5] around the wound. The medical examiner estimated the gun was four to eight inches from the wound when it was fired. This wound was fatal.

Another bullet entered a little higher than the first bullet but more toward the midline of the body, traveled from slightly right to left and went downward at a 45 degree angle. This bullet went through the heart and inflicted a fatal wound. The medical examiner concluded, based on the stippling around the wound, that the gun was fired from a distance of 12 to 18 inches.

A third bullet entered Jay's front chest and was "at such an angle that it actually abraded or scraped the skin before going into" Jay. The bullet went through the front of the chest, outside of the ribs, through the front abdominal wall, down through the front of the pelvis and into the thigh. This bullet went primarily downwards, slightly left to right and minimally front to back.[6] This injury was not fatal.

Vorise's fingerprints were found on the bicycle and on the glass door of the apartment foyer.[7]

Until the last day of testimony, Vorise's defense was based on alibi and misidentification. On the last day of testimony, Vorise testified and admitted shooting the victim.[8] Vorise denied stealing the bicycle; he stated he had borrowed it from a friend. He went to the apartment building to return a gun another friend had left at his house the previous day. After Vorise rang the

---

[4]The medical examiner who performed the autopsy did not testify about the order of the wounds.

[5]Stippling occurs "when burned or unburned gunpowder comes out of the muzzle of the gun behind the bullet that it's projecting or forcing out."

[6]There was no stippling found around this wound and no stippling came through the T-shirt the victim was wearing; thus the medical examiner could conclude only that it was not "a contact wound or a close-to-contact wound."

[7]The glass door of the apartment building had been cleaned on the Thursday before the shooting, which occurred on a Sunday.

[8]Vorise testified the first time he had admitted to anyone that he killed Jay was on the previous Friday when he told his attorney. He explained he had not told anyone earlier

call box in the apartment building's foyer for his friend's apartment, Jay entered.

Jay grabbed the bicycle and accused Vorise of stealing it. Vorise denied stealing the bicycle and said he "got it from some guy on the street." At that point, although he was "trying to talk [him]self out of it," Vorise realized the bicycle was probably stolen. Carol walked up behind the bicycle and nodded her head as Vorise was "telling them I'm sorry if this is your bicycle, but I did not steal it." Carol said she was going to call the police and started to walk away. Jay lifted up the front wheel of the bicycle a little bit so Vorise "couldn't move it or anything."

At this point, Vorise pulled the gun out of his jacket and pointed the gun at Jay. Vorise said, "Oh, no you're not"[9] because he "wanted to scare" Jay. He was afraid Jay would chase him. Vorise also testified he pulled the gun because he "just didn't want to get in trouble for nothing was [his]. Neither the bike nor the gun was [his]. So it's like [he was] trying to keep a clean record" and was "in a mix of something that . . . [he] didn't expect . . . ." Vorise expected Jay to back up, at which point Vorise would "run like the wind" but Jay grabbed the gun and tried to pull it his way. When the gun went off the first time, Jay had a "look of shock" but continued to try to take the gun away. Vorise "jumped off" the bicycle and continued to struggle over the gun, which went off a second time. Jay let go of the gun and "was falling back" or was "bent over." Vorise fired the gun once as Jay "was like bending over" and then fired the last shot at a car.[10] Vorise "just panicked" when he shot Jay the third time and was not trying to hit him the fourth time he fired at him. "[E]verything happened so fast." After the shooting, Vorise looked at Carol, who sprayed him in the eyes with pepper spray. He ran out of the building with his eyes burning, stopped by a friend's house to wash his face, and then went home.

DISCUSSION

I

*Sufficiency of Evidence of Premeditation and Deliberation*

■■■ Vorise contends there was insufficient evidence to support a finding he premeditated and deliberated the killing.

---

"[b]ecause I was ashamed of what happened," he was sorry and because both families "deserve to know the truth."

[9]On cross-examination, Vorise testified he said, "Oh, no, you're not. Just take——" when he pulled out the gun. He meant Jay should just take the bicycle.

[10]On direct examination, Vorise testified he had fired the fourth shot to the left of the victim, deliberately aiming away from the victim, but did not mention shooting at a car.

■ "In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People* v. *Bolin* (1998) 18 Cal.4th 297, 331 [75 Cal.Rptr.2d 412, 956 P.2d 374].)

■ " '[P]remeditated' means 'considered beforehand,' and 'deliberate' means 'formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action.' " (*People* v. *Mayfield* (1997) 14 Cal.4th 668, 767 [60 Cal.Rptr.2d 1, 928 P.2d 485].) " ' " 'Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . .' " ' [Citation.] The law does not require that an action be planned for any great period of time in advance." (*People* v. *Rand* (1995) 37 Cal.App.4th 999, 1001 [44 Cal.Rptr.2d 686].)

■ Categories of evidence which are typically sufficient to sustain a finding of premeditation and deliberation include: (1) facts about a defendant's behavior before the incident that show planning; (2) facts about any prior relationship or conduct with the victim from which the jury could infer a motive; (3) factors about the manner of the killing from which the jury could infer the defendant intended to kill the victim according to a preconceived plan. (*People* v. *Anderson* (1968) 70 Cal.2d 15, 26-27 [73 Cal.Rptr. 550, 447 P.2d 942]; *People* v. *Thomas* (1992) 2 Cal.4th 489, 516-517 [7 Cal.Rptr.2d 199, 828 P.2d 101].) These categories are " 'intended to guide an appellate court's assessment whether the evidence supports an inference that the killing occurred as the result of preexisting reflection rather than unconsidered or rash impulse.' " (*People* v. *Bolin, supra,* 18 Cal.4th at pp. 331-332.) They represent a "synthesis of prior case law," but "are not a definitive statement of the prerequisites for proving premeditation and deliberation in every case." (*People* v. *Hawkins* (1995) 10 Cal.4th 920, 957 [42 Cal.Rptr.2d 636, 897 P.2d 574].) "[I]t is not necessary that [these] 'factors be present in some special combination or that they be accorded a particular weight.' " (*People* v. *Sanchez* (1995) 12 Cal.4th 1, 33 [47 Cal.Rptr.2d 843, 906 P.2d 1129]; *People* v. *Pride* (1992) 3 Cal.4th 195, 247 [10 Cal.Rptr.2d 636, 833 P.2d 643].) "For example, . . . the method of killing alone can sometimes support a conclusion that the evidence sufficed for a finding of premeditated, deliberate murder." (*People* v. *Memro* (1995) 11 Cal.4th 786, 863-864 [47 Cal.Rptr.2d 219, 905 P.2d 1305].)

■ Here, while there was little or no planning evidence, there was very strong motive and method of killing evidence. Vorise's motive in shooting

Jay, as found by the jury and supported by substantial evidence,[11] was to avoid a lawful arrest. The manner of killing also tended to show a premeditated and deliberated murder. The evidence supports an inference Jay was wounded during the second, third and fourth shots. Vorise fired the third and fourth shots, at least one of which was fatal, at close range into Jay's chest as Jay slumped against the wall. Vorise's manner was "[c]alm," "[c]ool," and "[f]ocused." Vorise's calm and cool firing of his gun twice at close range into the chest of an incapacitated victim supports a finding Vorise made a cold, calculated decision to kill the victim, i.e., that he acted with premeditation and deliberation.

No reversal is merited on this ground.

## II

*Special Circumstance—Murder to Avoid Arrest*

■ Vorise contends the evidence was insufficient to support a finding he murdered the victim to avoid lawful arrest and the court erred in refusing his request to modify the standard instruction to tell the jury the arrest must be "imminent."

Section 190.2, subdivision (a)(5) contains this special circumstance:

"The penalty for a defendant who is found guilty of murder in the first degree is death or imprisonment in the state prison for life without the possibility of parole if one or more of the following special circumstances has been found . . . to be true:

". . . . . . . . . . . . . . . . . . . . . . . . . . . .

"The murder was committed for the purpose of avoiding or preventing a lawful arrest, or perfecting or attempting to perfect, an escape from lawful custody." (§ 190.2, subd. (a)(5).)

The language of CALJIC No. 8.81.5 mirrors the statutory language. The jury was instructed:

"To find that the special circumstance, referred to in these instructions as murder to prevent arrest is true, the following facts must be proved:

---

[11]As we explain in part II, *post*, substantial evidence supports this determination.

"1. The murder was committed for the purpose of avoiding or preventing a lawful arrest." (CALJIC No. 8.81.5.)[12]

The California Supreme Court has addressed this special circumstance in three cases: *People* v. *Bigelow* (1984) 37 Cal.3d 731 [209 Cal.Rptr. 328, 691 P.2d 994, 64 A.L.R.4th 723], *People* v. *Coleman* (1989) 48 Cal.3d 112 [255 Cal.Rptr. 813, 768 P.2d 32] and *People* v. *Cummings* (1993) 4 Cal.4th 1233 [18 Cal.Rptr.2d 796, 850 P.2d 1].

In *Bigelow*, the murder victim picked up two hitchhiking prison escapees who forced the victim to drive to a remote location and killed him. The prosecutor argued the victim was killed so he would not report the robbery and kidnapping, a report which might eventually lead to an arrest. The *Bigelow* court concluded the evidence was insufficient to support the special circumstance. The court found the prosecutor's argument was "totally speculative" and would lead to "an unreasonably expansive reading of the special circumstance of avoiding arrest, a reading which would cause that circumstance to overlap extensively with felony murder."[13] (*People* v. *Bigelow, supra,* 37 Cal.3d at p. 752.) The court stated, "We believe the special circumstance of avoiding arrest should be limited to cases in which the arrest is imminent." (*Ibid.*)

In *Coleman,* the defendant had earlier entered the victim's house, which was located in a rural area. He surprised the victim when she entered her home, and pointed a shotgun at her. As the victim attempted to escape, she yelled through a partially open doorway to a neighbor to call the police but there was no evidence the neighbor could or did hear her. Immediately thereafter the defendant shot the victim. The *Coleman* court held the evidence was insufficient to support the special circumstance. The court

---

[12]The jury was also instructed, pursuant to CALJIC No. 8.80.1, it was necessary that the prosecutor prove the special circumstance beyond a reasonable doubt.

[13]In a footnote, the *Bigelow* court noted the killing of a witness to prevent his testimony was a special circumstance. The court stated: "This circumstance applies only if 'the killing was not committed during the commission, or attempted commission of the crime to which he was a witness.' (§ 190.2, subd. (a)(10).) The qualifying language avoids applying the 10th circumstance to cases in which the defendant kills the victim of a robbery or other crime to prevent him from testifying to that crime.

"The prosecutor's reading of the fifth special circumstance (avoiding arrest) would nullify that qualifying language. Under that theory, all the prosecutor would have to do is to claim that the victim was killed not only to prevent him from testifying in court but also to prevent him from reporting the crime to the police, and the result would be to extend the avoiding arrest circumstance to virtually all felony murders." (*People* v. *Bigelow, supra,* 37 Cal.3d 731, 752, fn. 13.)

rejected the People's argument the *Bigelow* case was distinguishable on the basis the victim in *Coleman* "had set the wheels in motion by yelling to her neighbor." (*People* v. *Coleman, supra,* 48 Cal.3d at p. 146.) The court noted there was no evidence the neighbor could or did hear the victim. The court concluded: "[T]here was no evidence that any imminent arrest was possible under the circumstances." (*Ibid.*) The court also stated: "It is suggested that [the neighbor] might have made a citizen's arrest, but there is no evidence of facts apparent to defendant that [the neighbor] had the intention or capability of doing so." (*Ibid.*)

In the most recent case, *People* v. *Cummings, supra,* 4 Cal.4th 1233, the court held the evidence was sufficient to support the special circumstance and it was not required that the jury be instructed the arrest be "imminent." In *Cummings,* the defendants were convicted of the first degree murder of a police officer who had stopped a stolen vehicle in which they were passengers. Prior to being stopped, the defendants had committed several robberies and related offenses. A few days before the murder of the police officer, one of the defendants had stated he was not going back to jail.

The *Cummings* court distinguished *Bigelow* and *Coleman,* noting that in both those cases while the victim may have been killed to prevent the police from being summoned and "[t]he defendant's long-range goal may have been the avoidance of arrest, but the immediate goal was simply to prevent the possibility that the police would eventually learn of the crime and the defendant's relation to it, and then arrest the defendant." (*People* v. *Cummings, supra,* 4 Cal.4th 1233, 1300.) In *Cummings,* "by contrast, defendants had been detained by the police officer victim under circumstances which would lead them and any objective observer to believe that an arrest was highly likely. Arrest was or appeared to be 'imminent.' " (*Ibid.*)

The *Cummings* court rejected an argument (based on *Bigelow*) that " 'imminent' arrest is an element of the special circumstance." The court explained: "Our *Bigelow* opinion did not alter the statutory elements of the special circumstance defined in section 190.2, subdivision (a)(5). It construed the section and concluded that the evidence in that case was insufficient to sustain the jury finding." (*People* v. *Cummings, supra,* 4 Cal.4th at p. 1300.) The *Cummings* court held the instructions given (which like the instructions here did not state the arrest needed to be imminent) were proper. (*Ibid.*) The court added, "Had the possibility of arrest been more remote, i.e., had there been no peace officer present or less reason to believe the defendant feared arrest, a supplemental instruction might have been appropriate, but the failure to give one here was not error, let alone error of constitutional dimension." (*Id.* at pp. 1300-1301.)

Vorise argues the evidence was insufficient to support the special circumstance finding because, like the *Bigelow* and *Coleman* cases, the evidence here showed, perhaps, a long-range goal of avoiding arrest but an immediate goal to prevent the police from being summoned and the possibility the police would eventually learn that he was carrying a weapon and riding a stolen bicycle. He argues there were "no facts here which would have caused [him] or any objective observer to believe that an arrest was or appeared to be imminent." We disagree.

The evidence shows Vorise pulled out his loaded gun, pointed it at the victim and said, "Oh, no, you aren't" in response to Carol's statement she was going to call the police. Vorise admitted he knew at that time the bicycle was stolen and that he did not want "to get in trouble" for possessing the stolen bicycle or the loaded, concealed firearm. From this evidence—the timing of when Vorise drew his gun, his statement at the time and his testimony at trial—a reasonable jury could infer that Vorise believed he would be imminently arrested for being in possession of the stolen bicycle and loaded, concealed weapon if the victims were allowed to proceed and that he committed the murder to avoid that arrest. An objective observer could also reach the conclusion Vorise would be imminently arrested. Unlike *Bigelow* and *Coleman*, here there was a direct connection between the perceived threat of imminent arrest and the murder; the special circumstance finding here was not based on mere speculation.

Vorise contends the court erroneously refused his request to modify the standard instructions on the special circumstance to tell the jury it was necessary to find the arrest was "imminent." The trial court declined to modify the standard CALJIC instruction and stated defense counsel could "argue imminence as part of [his] arguments to the jury."

As noted above, the California Supreme Court in *Cummings* rejected the argument that " 'imminent' arrest is an element of the special circumstance." (*People* v. *Cummings, supra,* 4 Cal.4th at p. 1300.) Vorise points out that the *Cummings* court suggested such an instruction might be appropriate if "the possibility of arrest [had] been more remote, i.e., had there been no peace officer present or less reason to believe the defendant feared arrest." (*Id.* at pp. 1300-1301.) He argues this is such a case. We disagree. While there was no peace officer present at the time Vorise murdered Jay, there was, as noted above, strong evidence showing Vorise feared imminent arrest, i.e., Vorise knew the bicycle was stolen and he was in possession of a concealed loaded firearm. There was also strong evidence that the killing was directly connected to Carol's statement she was going to call the police. The facts of this case are not close and did not require a modification of the standard

instructions. As in *Cummings*, the court properly instructed the jury on the special circumstance.

No reversal is merited on this ground.

### DISPOSITION

The judgment is affirmed.

Work, J., and Benke, J., concurred

Appellant's petition for review by the Supreme Court was denied July 28, 1999.