Filed 5/19/16  P. v. Galayan CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B258290 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA371650) |
| v. | |
| GENNADIY GALAYAN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Stephen A. Marcus, Judge.  Affirmed in part and reversed in part.

Melanie K. Dorian, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Victoria B. Wilson and Idan Ivri, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Defendant Gennadiy Galayan appeals from his convictions of attempted premeditated murder, four counts of assault with a semiautomatic firearm, three counts of false imprisonment of a hostage, two counts of dissuading a witness and one count of corporal injury to a spouse.[1] On appeal, he contends: (1) insufficient evidence supports the false imprisonment of a hostage convictions; (2) the trial court had a sua sponte duty to instruct on misdemeanor false imprisonment as a lesser included offense of false imprisonment of a hostage; (3) it was an abuse of discretion to impose consecutive sentences; and (4) Penal Code section 654 precludes a separate sentence for assault with a firearm, false imprisonment of a hostage and dissuading a witness as to each of the three victims.[2] In addition, at our request, the parties provided supplemental briefing on issues relating the application of section 654 to enhancements. We reverse the judgment as to the sentence only and otherwise affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

Viewed in accordance with the usual rules on appeal (*People v. Zamudio* (2008) 43 Cal.4th 327, 357), the evidence established that defendant and attempted murder victim Eugenia S. were married in Russia in 1996. Their only child, A.S., was born in Russia in 2000. In 2004, the family moved to the United States. When they divorced in December 2006, defendant and Eugenia were awarded joint legal custody of A.S., but

---

[1] As we discuss more fully in the text, four different victims were involved in defendant's crime spree. Defendant was charged by information with attempted premeditated murder (count 1); assault with a semiautomatic firearm (counts 2, 5, 9, 13); first degree burglary (count 3), corporal injury to a spouse (count 4); false imprisonment of a hostage (counts 7, 11, 15); and dissuading a witness (counts 8, 12); various enhancements were also alleged. A jury found defendant not guilty of burglary (count 3) but guilty of all other charges; it also found true enhancements for great bodily injury (count 1, 2, 4), personal firearm use (counts 1, 2, 4, 5, 7, 8, 9, 11, 12, 13, 15) and using force to intimidate a witness (counts 8, 12). Defendant was sentenced to a total of 66 years, 8 months in prison. He timely appealed.

[2] All future undesignated statutory references are to the Penal Code.

Eugenia was awarded sole physical custody.  In January 2008, defendant took A.S. to Russia without Eugenia's permission and refused to bring him back.  Eugenia traveled to Russia in February 2008 and brought A.S. back to the United States that June.  Defendant also returned to the United States but his visitation rights were terminated.  By May 2010, Eugenia had sole physical and legal custody of A.S. and defendant had no visitation rights.  Defendant had seen A.S. only from afar, when he watched A.S. playing on the school playground.

In May 2010, Eugenia lived in a controlled access apartment building on Las Palmas Avenue in Los Angeles.  When Eugenia first moved into that building, she lived in apartment No. 108, but by May 2010 she had moved into apartment No. 104.  Victim Alla Z. lived across the hall from Eugenia, in apartment No. 106.  Victim Lyubov S. was the apartment building manager and victim Jesus H. was a maintenance worker in the building.  Eugenia, Lyubov, Alla and defendant spoke Russian; Jesus spoke Spanish.  Although all spoke some English, they each testified with a translator.

### 1.    Eugenia S. (Counts 1, 2, 4)

At about 1:30 p.m. on May 20, 2010, A.S. was in school when Eugenia parked in the apartment building garage and took the elevator to the first floor.  She was walking to her apartment carrying grocery bags when she encountered defendant in the hallway.  Seeing that defendant was holding a gun, Eugenia dropped her bags and screamed for help.  While kicking her repeatedly, defendant told Eugenia to "shut up" and "stop screaming," and threatened to shoot her if she did not stop.  Eugenia tried to run away, but defendant caught her, pushed her to the ground and resumed kicking her; Eugenia did not know whether he hit her with the gun, too.  Defendant did not stop kicking Eugenia until Lyubov and Jesus arrived at the scene.

After announcing he had come to kill Eugenia, defendant pointed the gun at Lyubov and Jesus and ordered them to give him their cell phones.  When Alla arrived at the scene a few minutes later, defendant pointed the gun at her and reiterated that he was

3

there to kill Eugenia. Defendant ordered Eugenia to accompany him to the school to pick up A.S.

Eugenia was still on the ground when she noticed a police officer had arrived. When defendant turned toward the officer, Lyubov and Alla ran into a passageway. Defendant turned back toward Eugenia and started shooting. Eugenia did not know how many times defendant shot her, but she recalled he shot her in the back as she tried to crawl away.

Eugenia was transported by ambulance to Cedars-Sinai Hospital where she received treatment for multiple-bullet wounds; two bullets that were lodged in her chest required a second surgery to remove. It was stipulated that the bullets recovered from Eugenia's chest wound were fired from defendant's Berreta, which was recovered at the scene.

The day after the shooting, Eugenia was still hospitalized when she told Detectives Nadine Hernandez and Steve Ramirez that, during the incident, defendant said, "Why didn't you just let me see my son? If you didn't give me my son, I'm going to shoot you in the head. Our child never wanted to live with you. Only me. I don't care if I go to jail but you won't keep my child. He won't live with you." Hernandez did not ask Eugenia whether defendant was speaking in English or in Russian.

### 2. Lyubov S. (Counts 9, 11, 12*)*

Lyubov was in the lobby with Jesus when she heard a "horrifying scream." She went with Jesus to investigate. When they got off the elevator on the first floor, Lyubov saw shopping bags on the ground in front of apartment No. 109. Jesus was behind her as Lyubov turned left down a hallway. Lyubov was terrified when, upon making the turn, she saw defendant pointing a gun at her and Eugenia on the ground, covered in blood. When Lyubov took out her cell phone to call the police, defendant instructed her (in Russian) to throw the phone to him. Lyubov complied because she was afraid defendant would shoot her if she refused. Jesus passed some napkins to Lyubov, who used them to attend to Eugenia. When tenant Alla arrived a short while later, defendant directed her to

4

stand next to Lyubov and Jesus. Defendant gave Lyubov permission to retrieve a piece of cloth from the laundry room to use on Eugenia's wounds. Lyubov was afraid defendant would shoot her if she tried to escape. Eventually, Lyubov heard the elevator doors open and saw two police officers look out. When defendant started shooting Eugenia, Lyubov ran in the opposite direction, behind Alla. As she was running, Lyubov felt a burning sensation in her back. Lyubov later discovered that she had been grazed by a bullet.

### 3. Jesus H. (Counts 5, 7, 8)

Jesus's account of events was consistent with Eugenia's and Lyubov's in all material respects. Defendant, Lyubov and Eugenia spoke in a language that Jesus did not understand. Jesus gave defendant his cell phone because he was afraid defendant would shoot him if he did not. When the police arrived, defendant took cover in the alcove in front of an apartment door and started shooting Eugenia. Apparently mistaking Jesus for a perpetrator, the police shot Jesus three times. Jesus survived his wounds.

### 4. Alla Z. (Counts 13, 15)

Alla's account was also consistent in all material respects. Alla had carried her bags up the stairs to her first floor apartment when she heard Lyubov arguing with someone in Russian. Before entering her apartment, Alla peeked around the corner. She saw Eugenia on the ground, crying. Alla complied when defendant pointed a gun at her and told her to drop everything and to come towards him. Defendant reacted to the arrival of the police by shooting at Eugenia.

*A.    Defense Case*

### 1. Defendant

Defendant worked as a taxi driver and purchased the Berreta for self-protection; he did not have a concealed weapon permit.

5

In May 2010, defendant was homeless and sleeping on a friend's sofa. Because he had nowhere to leave his belongings, he carried them around with him in a briefcase. On the day of the shooting, May 20, 2010, defendant went to A.S.'s school to see him on the playground, but A.S. was not there. Defendant decided to go to Eugenia's apartment to talk to her about allowing him to see A.S. Defendant packed his brief case with gifts for A.S. and many photographs of the family in happier times, which he thought might move Eugenia; he also packed the unloaded Berretta, ammunition for the Berretta, his passport, two Phillips head screw drivers and plastic gloves.

Defendant did not have a key or access code to enter Eugenia's apartment building, but he was let in by someone exiting the building. Once inside, he knocked on the door to apartment No. 108 (the apartment in which he thought Eugenia still lived). When no one answered, defendant placed the photographs on the ground in front of the door and waited for Eugenia's arrival. During the next 30 or 40 minutes, defendant went downstairs several times to look for Eugenia. When defendant saw her car approaching, he went back upstairs and stood away from apartment No. 108 so Eugenia could not see him when she arrived and would have time to see the photographs. His plan was to surprise Eugenia after she opened the apartment door and to go into her apartment. But when Eugenia got off the elevator, she walked in an unexpected direction and encountered defendant standing in the hallway. When defendant said, "Hi," Eugenia dropped her bags, fell to the ground and started screaming for help. Defendant tried to convince her to stop screaming but when that failed, he took the unloaded gun out of his briefcase. Eugenia jumped up and ran away. Defendant ran after her with the intention of calming her down. Defendant testified, "I knock her down, and I hit her a couple of times, and after I hit her a couple of times, she then quiet and stopped screaming." When Eugenia stopped screaming, defendant stopped hitting her. Defendant pointed the gun at Eugenia to scare her. Within a few seconds, Lyubov and Jesus arrived and Eugenia yelled to them that defendant had a gun and to call the police. When Lyubov and Jesus took out their cell phones, defendant moved towards them and told them not to call. To prevent them from calling the police, defendant showed them the gun so they would

6

know he was armed, but he did not point it at them. Also to prevent them from calling the police, defendant ordered Lyubov and Jesus to give him their cell phones, but he did not tell him that they could not leave. After Lyubov and Jesus gave their phones to defendant, defendant loaded the gun. Defendant explained, "I loaded the gun when the manager and the Mexican worker came in. After I took the phones from them, I took the magazine and loaded the pistol. . . . I was scared when this Mexican guy was standing next to me. He wasn't doing anything. He was standing there motionless, but I was afraid that he was going to get in my way." Alla arrived a few minutes after defendant had loaded the gun. Lyubov and Alla told defendant that Eugenia was wrong for keeping A.S. from him and urged him to put away the gun.

The police arrived about 10 or 15 minutes after defendant loaded the gun. Defendant recalled seeing two police officers and hearing loud yelling, but does not remember what happened next. "[E]verything went dark and blank, and I saw no one and nothing." He did not hear gunshots or screaming. He knows he fired his gun because he saw the expended bullets, but does not remember doing so.

### 2. Post Traumatic Stress Disorder (PTSD)

Defendant testified that he is an ethnic Armenian born in Azerbaijan. After two years in the Russian army, he witnessed the ethnic strife between the Azerbaijanis and the Armenians. Following the collapse of the Soviet Union, he participated in the fighting and saw people he knew killed and maimed. He still has terrible nightmares about his combat experiences; he also has occasional blackouts. In May 2010, he was very depressed about not having seen A.S. for two years. He did not seek or obtain help. At the time of trial, he was seeing a doctor about his depression, taking an antidepressant and something to help him sleep.

Dr. Haig Kojian, an expert in PTSD, described the symptoms of PTSD. Dr. Kojian met with defendant three times. Some of their communications were through a Russian translator, some were in Armenian and some were in English. Defendant did not appear delusional or psychotic. Dr. Kojian diagnosed defendant with PTSD as a result of

7

his combat experiences and major depression as a result of being unable to see his child. Dr. Kojian did not believe defendant was exaggerating the traumatic experiences of his life; on the contrary, he thought defendant was minimizing.

## DISCUSSION

*A.     Sufficiency of the Evidence of False Imprisonment of a Hostage*

Defendant's challenge to the sufficiency of the evidence is limited. He contends only that there was insufficient evidence to support his convictions of false imprisonment of a hostage in violation of section 210.5 (counts 7 as to Jesus, 11 as to Lyubov, and 15 as to Alla). He argues there was no evidence of any threat of imminent arrest or that he intended to avoid that threat by detaining the victims. Rather, he suggests the only "rational" inference from the evidence was that defendant was using the victims "as leverage to force Eugenia to agree to grant him visitation rights; the thought of being arrested or evading the police did not enter his mind, and there was no credible evidence to the contrary." We disagree.

We begin with the standard of review for any challenge to the sufficiency of the evidence. We must review the whole record in the light most favorable to the prosecution, presuming in support of the judgment the existence of every fact the jury could reasonably have deduced, to determine whether there is evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*Zamudio, supra*, 43 Cal.4th at p. 357.) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict. [Citation.]" (*Ibid.*) The standard is the same where the prosecution relies primarily on circumstantial evidence. "We 'must accept logical inferences that the jury might have drawn from the circumstantial evidence. [Citation.]' [Citation.] 'Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the

8

jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.]' [Citation.] Where the circumstances reasonably justify the trier of fact's findings, a reviewing court's conclusion the circumstances might also reasonably be reconciled with a contrary finding does not warrant the judgment's reversal. [Citation.]" (*Id.* at pp. 357-358.) We now turn to the elements of the offense.

We first distinguish misdemeanor false imprisonment, felony false imprisonment and the crime here – false imprisonment of a hostage. "False imprisonment is the unlawful violation of the personal liberty of another." (§ 236.) It is a misdemeanor unless it is "effected by violence, menace, fraud, or deceit," in which case it is a felony. (§ 237.) Known as "false imprisonment of a hostage," violation of section 210.5 results in greater punishment where the false imprisonment is committed "for purposes of protection from arrest, which substantially increases the risk of harm to the victim, or for purposes of using the person as a shield . . . ." To satisfy the "for purposes of protection from arrest" element of section 210.5, there must be proof of a "threat or risk of *imminent* arrest." (*People v. Gomez* (1992) 2 Cal.App.4th 819, 825; CALCRIM No. 1241 [conviction requires finding defendant "faced a threat or risk of imminent arrest" and that he "intended to protect himself against that threat of imminent arrest by restraining the other person."].)**3**

"Imminent arrest" within the meaning of section 210.5 has not been defined by any court. But we take guidance from four cases discussing the meaning of "imminent arrest" in the context of special circumstance murder "committed for the purpose of avoiding or preventing a lawful arrest, or perfecting or attempting to perfect, an escape from lawful custody." (§ 190.2, subd. (a)(5); see *People v. Cummings* (1993) 4 Cal.4th

---

**3**      *Gomez* was disapproved on other grounds in *People v. Lewis* (2008) 43 Cal.4th 415, 419, fn. 29 [disapproving cases to the extent they held robbery is a lesser included offense of kidnapping for robbery for purposes of the rule barring conviction on greater and necessarily included lesser offense]. *Lewis* in turn was disapproved on other grounds in *People v. Black* (2014) 58 Cal.4th 912, 919 [disapproving cases to the extent they held defendant was denied fair trial by failure to grant additional peremptory challenges]. *Gomez*'s analysis of section 210.5 is unaffected by subsequent negative history.

9

1233 (*Cummings*); *People v. Coleman* (1989) 48 Cal.3d 112 (*Coleman*); *People v. Bigelow* (1984) 37 Cal.3d 731 (*Bigelow*); *People v. Vorise* (1999) 72 Cal.App.4th 312 (*Vorise*).)

In *Bigelow*, our Supreme Court held section 190.2, subdivision (a)(5) should be limited to cases in which "the arrest is imminent." (*Bigelow, supra,* 37 Cal.3d at p. 752.) It found the following evidence was not sufficient to support that element of the special circumstance: the defendants escaped from a Canadian prison in July 1980 and made their way to California; in August 1980, after the victim picked up the hitchhiking defendants, they forced the victim to drive them to Los Angeles; but on the way, they instructed him to exit the freeway and drive to a remote location where they shot him and left his body. The *Bigelow* court reasoned that, at the time they killed the victim, the defendants "were not under arrest and were not threatened with imminent arrest. Although the prosecutor surmised that [the victim] was killed so that he would not report the robbery and kidnapping – a report which might eventually lead to the men's arrest – this argument is totally speculative." (*Ibid*.)

In *Coleman, supra*, 48 Cal.3d at pages 145-146, the section 190.2, subdivision (a)(5) finding was based on evidence the defendant was blocking the victim from leaving the house and threatening her with a shotgun when the victim yelled to a neighbor to call the police; the defendant immediately killed the victim with a single shotgun blast. Following *Bigelow*, the *Coleman* court found this evidence insufficient to support the special circumstance, reasoning that there was no evidence the neighbor could or did hear the victim.

In *Cummings, supra*, 4 Cal.4th 1233, the defendants, who had been involved in recent criminal activity, murdered the police officer who detained them for a traffic stop. Our Supreme Court found this evidence was sufficient to support the section 190.2, subdivision (a)(5) finding. It reasoned the circumstances of the defendants' detention "would lead them and any objective observer to believe that an arrest was highly likely. Arrest was or appeared to be 'imminent.' " (*Id*. at p. 1300.)

10

In *Vorise, supra*, 72 Cal.App.4th 312, the evidence showed the defendant "pulled out his loaded gun, pointed it at the victim and said, 'Oh, no, you aren't' in response to [the victim's] statement she was going to call the police. Vorise admitted . . . that he did not want 'to get in trouble' for possessing the stolen bicycle or the loaded, concealed firearm. From this evidence – the timing of when Vorise drew his gun, his statement at the time and his testimony at trial – a reasonable jury could infer that Vorise reasonably believed he would be imminently arrested for being in possession of the stolen bicycle and loaded, concealed weapon if the victims were allowed to proceed and that he committed the murder to avoid that arrest. . . . Unlike *Bigelow* and *Coleman*, here there was a direct connection between the perceived threat of imminent arrest and the murder; the special circumstance finding here was not based on mere speculation." (*Id*. at p. 322.)

The facts in this case are almost identical to those in *Vorise*. Defendant testified that he had already hit Eugenia and pointed an unloaded gun at her by the time Lyubov and Jesus arrived. He showed them the unloaded gun and took away their cell phones to prevent them from calling the police, but was not sure whether they had managed to do so before he got their phones. Defendant explained he "loaded the gun when the manager and the Mexican came in. After I took the phones from them, I took the magazine and loaded the pistol. . . . I was scared when this Mexican guy was standing next to me. He wasn't doing anything. He was standing there motionless. But I was afraid that he would get in my way." When Alla arrived, defendant ordered her to drop her bags and walk towards him.

From this evidence, a reasonable jury could infer that defendant believed he would be imminently arrested for assaulting Eugenia if the victims were allowed access to their cell phones or to leave the hallway, and that he falsely imprisoned them to avoid that arrest. An objective observer could also reach the conclusion that defendant would be imminently arrested if he did not restrain the victims so that they would not "get in his way." Lyubov and Jesus heard the screams from the lobby, Alla from the first floor hall. It was reasonable to conclude that one or more had called the police. As it turns out, police had been called and arrived minutes later.

11

Defendant's argument that this case is like *Coleman* because there was no evidence that any of the neighbors heard Eugenia's calls for help or actually called 911 is contrary to the evidence. First, Lyubov and Jesus both testified they heard Eugenia screaming. Second, from the arrival of a number of armed police officers within 15 minutes, it is reasonable to infer that someone called the police. Also unavailing is defendant's argument that he had no reason to fear imminent arrest because he took away the victims' cell phones. Finally, that defendant did not attempt to use any of the victims as shields is not evidence that he did not restrain them to avoid imminent arrest.

**B.**     *Instructions on Lesser Included Offenses of False Imprisonment of a Hostage*

Defendant contends he was denied due process and a fair trial by the trial court's failure to sua sponte instruct on misdemeanor false imprisonment as a lesser included offense of false imprisonment of a hostage. We find no error.

"The trial court has a duty to instruct the jury sua sponte on all lesser included offenses if there is substantial evidence from which a jury can reasonably conclude the defendant committed the lesser, uncharged offense, but not the greater. [Citations.]" (*People v. Brothers* (2015) 236 Cal.App.4th 24, 29.) There is no such duty when there is no evidence that the offense was less than that charged. (*People v. Campbell* (2015) 233 Cal.App.4th 148, 162.) We review the trial court's failure to instruct on a lesser included offense de novo, viewing the evidence in the light most favorable to the defendant. (*Brothers,* at p. 30.)

A lesser offense is necessarily included in a greater offense if the statutory elements of the greater offense include all of the elements of the lesser offense, such that the greater offense cannot be committed without also committing the lesser offense. (*People v. Banks* (2014) 59 Cal.4th 1113, 1160, overruled on another point in *People v. Scott* (2015) 61 Cal.4th 363, 391, fn. 3.) False imprisonment of a hostage is defined in section 210.5 as follows:

> "Every person who commits the offense of false imprisonment, as defined in Section 236, against a person for purposes of protection from arrest,

12

which substantially increases the risk of harm to the victim, or for purposes of using the person as a shield is punishable by imprisonment pursuant to subdivision (h) of Section 1170 for three, five, or eight years."

Thus, false imprisonment of a hostage (§ 210.5) cannot be committed without committing misdemeanor false imprisonment (§ 236). Accordingly, misdemeanor false imprisonment is a lesser included offense of false imprisonment of a hostage. The Attorney General agrees.

Although misdemeanor false imprisonment is a lesser included offense of false imprisonment of a hostage, the trial court had no sua sponte duty to instruct on misdemeanor false imprisonment in this case, because there was no evidence from which a rational trier of fact could conclude defendant committed only misdemeanor false imprisonment. The only reasonable inference from the evidence that defendant detained the victims after they came upon him while he was viciously beating Eugenia, and defendant's own testimony explaining his actions, is that defendant's sole purpose in violating the victims' liberty was to protect himself against the imminent threat of arrest posed by the victims. Nor can there be any dispute that restraining the victims substantially increased the risk of harm to them. (§ 210.5.)

C.      *Sentencing Issues*

Defendant raises two sentencing issues. He contends: (1) section 654 bars separate punishments for assault with a firearm, false imprisonment of a hostage and dissuading a witness when committed against a single victim; and (2) imposition of consecutive sentences on some counts was an abuse of discretion. In addition, we asked for supplemental briefing on two issues (1) if we were to conclude that the sentences for false imprisonment of a hostage and dissuading a witness (counts 7 and 8 as to Jesus, counts 11 and 12 as to Lyubov) were subject to section 654, would the related enhancements also be subject to the statute; and (2) whether the section 654 stays of only

13

the enhancements (not the underlying sentence) on counts 5, 9 and 15 were unauthorized sentences.[4]

We conclude: (1) section 654 barred only separate punishment for false imprisonment of a hostage and dissuading a witness as to Jesus (counts 7 and 8) and Lyubov (counts 11 and 12); (2) when sentence on the underlying offense is stayed pursuant to section 654, the attendant enhancements must also be stayed; and (3) section 654 does not bar imposition of the same enhancement on each separately punishable substantive offense.

    1.    <u>The Sentence</u>

        **a.**    **The base term**

Defendant was sentenced to a total of 66 years, 8 months in prison. The trial court selected count 1 (attempted murder of Eugenia) as the base term. It sentenced defendant to 25 years to life on that count, comprised of the 9-year high term for the attempted murder, plus 25 years to life for a section 12022.53, subdivision (d) enhancement for personal discharge of a firearm causing great bodily injury. The trial court stayed all other enhancements found true as to count 1. (See § 12022.53, subd. (f) [only one § 12022.53 enhancement may be imposed per crime].)[5] Pursuant to section 654, the trial

---

[4]    We also asked the parties to brief whether the stay of the enhancement on count 13 was also unauthorized. In fact the trial court imposed, but did not stay, an enhancement on that count. Both parties pointed out our error, and we do not address count 13 separately.

[5]    The stayed enhancements on count 1 were for personal firearm use, personal and intentional discharge of a firearm, gang participation, and personal infliction of great bodily harm. (§§ 12022.53, subds. (b), (c), (d); 12022.7, subd. (e).) We note here the trial court properly imposed and stayed the sentences on the multiple gun use enhancements after imposing the 25-years-to-life enhancement pursuant to section 12022.53, subdivision (d). However, the enhancement for inflicting great bodily injury, pursuant to section 12022.7, subdivision (e), is an enhancement of a different nature than the gun use enhancements. Enhancements involving different conduct may each be added consecutively. (*People v. Ahmed* (2011) 53 Cal.4th 168.) If the court chooses not to impose punishment on the section 12022.7, subdivision (e) enhancement, however, it must either strike the enhancement, which it has authority to do under section

14

court imposed but stayed sentence on the assault with a firearm conviction as to Eugenia (count 2).

### b. Concurrent sentences

The trial court imposed concurrent sentences for false imprisonment of a hostage and the attendant section 12022.5, subdivision (a) gun use enhancement as to Jesus (count 7) and Lyubov (count 11).

### c. Consecutive sentences

Not including enhancements, the trial court imposed the following one-third the middle base term sentences to run consecutively to count 1: one year for corporal injury to a spouse (count 4); two years for assault with a firearm as to Jesus (count 5); two years for assault with a firearm as to Lyubov (count 9); two years for assault with a firearm as to Alla (count 13); three years for dissuading a witness as to Jesus (count 8); three years for dissuading a witness as to Lyubov (count 12); and one year, eight months for false imprisonment of a hostage as to Alla (count 15).

### d. Section 654 and the Enhancements

The jury found true a section 12022.5, subdivision (a) personal gun use enhancement on each count (except attempted murder). The trial court imposed the enhancement consecutive to the base term on just one crime associated with each victim:

- Count 4:  Eugenia, corporal injury to a spouse (one year, four months);[6]
- Count 8:  Jesus, dissuading a witness (ten years);
- Count 12: Lyubov, dissuading a witness (four years);
- Count 13: Alla, assault with a firearm (one year, four months).

---

1385, or strike the punishment for it. With very limited exceptions, none of which are applicable here, enhancements should not be stayed; they should be either imposed or stricken. (*People v. Bradley* (1998) 64 Cal.App.4th 386, 390.) "Unless a statute says otherwise [e.g., section 654], an enhancement may be imposed or stricken, but . . . may not be stayed; to do so is an illegal sentence. [Citation.] [Citation.]" (*People v. Haykel* (2002) 96 Cal.App.4th 146, 151.)

[6]   As to count 4, a section 12022.7, subdivision (e) great bodily injury enhancement was also pled and proved. The trial court imposed a consecutive one year, four months for that enhancement.

As to the remaining counts, the trial court either included the enhancement as part of a concurrent sentence (counts 7 and 11), or imposed a consecutive sentence but stayed sentence only on the attendant enhancement (counts 5, 9 and 15).

      2.      <u>The Trial Court Stated Adequate Reasons for Imposing Consecutive</u>
               <u>Sentences</u>

Defendant challenges the consecutive sentences imposed on counts 4, 5, 8, 9 12, 13 and 15. He argues the trial court did not state adequate reasons for imposing consecutive sentences and that defendant "is not a violent criminal with no regard for public safety, as the court found." We find no error.

The trial court is required to state its reasons for selecting consecutive sentences. (§ 1170, subd. (c).) But "there is no requirement that, in order to justify the imposition of consecutive terms, the court must find that an aggravating circumstance exists. (See § 669; Cal. Rules of Court, rule 4.425(a), (b).)[7] Factual findings are not required. . . . [T]he reasons given for imposing a consecutive sentence need only refer to the 'primary factor or factors' that support the decision to impose such a sentence. (Cal. Rules of Court, rule 4.406(a), (b); § 1170, subd. (c); [citation].)" (*People v. Black* (2007) 41 Cal.4th 799, 822, overruled on other grounds in *People v. Cunningham* (2007) 546 U.S. 270.) Some of the criteria the trial court may consider in deciding between concurrent and consecutive sentences are whether the crimes had multiple objectives, whether they involved separate acts or threats of violence and whether they were committed in a short span of time. (Rule 4.425.) The trial court may not use as the reason for selecting a consecutive sentence a fact that was an element of the crime, used to impose the upper term, or to enhance the sentence. (Rule 4.425.)

Here, at the beginning of its pronouncement of the sentence, the trial court explained why it was selecting the high term for attempted murder: "The crime involved great violence, great bodily harm. The fact that many of the victims in this particular case were particularly vulnerable. The fact that the defendant was armed with or used a

---

[7]     All future rule references are to the California Rules of Court.

weapon. Potentially the fact that the defendant threatened witness although it's in sort of a different situation [¶] Also when I eventually sentence the defendant some of the sentences are going to be concurrent instead of consecutive, and finally the defendant engaged in violent conduct that indicates that he's a serious danger to society, and I'm going to indicate the reason for what is that when the police arrived at the location and they were there and the situation could have been defused and no one hurt, the defendant chose to fire several bullets into his wife indicating a total and complete disregard for societal – I mean they were actually right there, the police, and he still attempted to kill her."

Defendant did not object to the adequacy of the trial court's statement of reasons for making some sentences consecutive. The point on appeal is thus waived. (*People v. Scott* (1994) 9 Cal.4th 331, 352-356.) Even assuming the error was not waived, the trial court's statement, even if concise, was sufficient to satisfy its duty to state reasons for imposing consecutive sentence by referring to the "primary factors" underlying its sentencing choice.

3. Section 654 and the Sentences for Assault With a Firearm, False Imprisonment of a Hostage and Dissuading a Witness

Defendant contends section 654 bars imposition of separate sentences on the convictions for assault with a firearm, false imprisonment of a hostage and dissuading a witness as to Jesus (counts 5, 7 and 8) and Lyubov (counts 9, 11 and 12), and the convictions for assault with a firearm and false imprisonment of a hostage as to Alla (counts 13, 15). Defendant reasons he should be sentenced to one term for each victim because all eight crimes arose from the single act of pointing a gun at the three victims and in doing so he had a single criminal objective – to prevent the victims from contacting the police.[8] We agree only as to the sentences imposed on the false

---

[8] Section 654 does not preclude multiple punishments for an act of violence against multiple victims. (*People v. Newman* (2015) 238 Cal.App.4th 103 (*Newman*).) Defendant does not dispute that he may be separately punished for the crimes committed against each of the three victims other than his wife – Jesus, Lyubov and Alla. He argues

17

imprisonment and dissuading a witness convictions as to Jesus (counts 7 and 8) and Lyubov (counts 11 and 12).

"An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." (§ 654.) In *Newman, supra,* 238 Cal.App.4th 103, we recently explained that section 654 "generally precludes multiple punishments for a single physical act that violates different provisions of law [citation] as well as multiple punishments for an indivisible course of conduct that violates more than one criminal statute. [Citations.]" (*Id*. at pp. 111-112.) Of the exceptions to section 654, we are concerned here with the exception for "a course of conduct if the defendant ' "entertained multiple criminal objectives which were independent of and not merely incidental to each other . . . ." ' [Citation.]" (*Id*. at p. 112.) The "multiple objectives" exception also applies where the defendant commits two crimes in pursuit of two independent, albeit simultaneous, objectives, and permits separate sentencing. (*People v. Douglas* (1995) 39 Cal.App.4th 1385, 1394.)

Application of the multiple objective exception "depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." (*Newman, supra*, 238 Cal.App.4th at p. 112, internal quotations and citations omitted.) Whether the defendant had one or more criminal objectives is a factual determination, which we review for substantial evidence. (*People v. Leonard* (2014) 228 Cal.App.4th 465, 499 (*Leonard*); *People v. Louie* (2012) 203 Cal.App.4th 388, 398 (*Louie*); *People v. Saffle* (1992) 4 Cal.App.4th 434, 438.)

*Louie*, *supra*, 203 Cal.App.4th 388, offers guidance. In that case, Louie and Ek were convicted of attempted murder, street terrorism, arson, dissuading a witness and criminal threats based on evidence that they were members of a criminal street gang

---

only that section 654 bars multiple punishment for more than one crime committed against a single victim under the circumstances.

active in the neighborhood in which the victim lived. In one encounter, two gang members (not defendants), threatened the victim that they would come back with a gun. About two months later, the victim called the police about gang members yelling and shooting guns. Not long after that, the victim was looking out the front door of her apartment at several people, including Louie and Ek, when Ek said to her, " 'Fuck you. You're a cop caller. Go inside, bitch. You're going to get yours . . . .' " (*Id*. at p. 392.) The victim closed the door. Fifteen minutes later, she heard breaking glass and saw her curtains go up in flames. The victim filed a police report. Someone came to the apartment and threatened to strike back if she testified. Two or three weeks later, the victim informed police that she had seen Ek. That day, Ek pointed a gun at her, called her a "cop-calling bitch," and said she was going to get hers, just like the night of the fire. (*Id*. at p. 391.)

The appellate court held section 654 did not preclude Ek being separately punished for witness intimidation and arson, where a reasonable interpretation of the evidence was that Ek harbored multiple criminal objectives: (1) punish the victim for reporting past criminal activities of the gang; (2) prevent the victim from reporting current criminal activities and (3) warn people what would happen to them if they reported the gang's criminal activities. (*Louie, supra,* 203 Cal.App.4th at pp. 398-399.) Further, the evidence showed a 15-minute gap between the verbal threat and the fire. (*Id*. at p. 399.) "Because defendants' course of conduct consisting of two criminal acts was incident to several objectives and was separated in time by an interval sufficient to allow them to reflect and renew their intent, the court properly sentenced defendants for the crimes of arson and dissuading a witness." (*Ibid*.) But the court came to a different conclusion with respect to Ek's argument that section 654 precluded separate sentences for dissuading a witness and making criminal threats arising out of his return to the victim's apartment after the arson. The court reasoned that the "threat was merely the method employed to attain the objective of dissuading the witness. [Citation.]" (*Ibid*.) We turn next to an application of these cases to the facts of this case.

19

### a. Multiple Criminal Objectives: Assault with a firearm on the one hand, and false imprisonment of a hostage and dissuading a witness on the other

The facts of this case support the trial court's implicit finding that defendant harbored one criminal objective when he committed the assaults with a firearm against Jesus, Lyubov and Alla (counts 5, 9 and 13) and a second criminal objective when he committed the false imprisonment of a hostage against the same three victims (counts 7, 11 and 15) and the dissuading a witness against Jesus and Lyubov only (counts 8 and 12).[9] A rational fact finder could conclude that defendant committed the assault with a firearm with the objective of preventing the victims from interfering with what he was doing to Eugenia. Once he accomplished that objective, defendant's criminal objective changed to protecting himself from imminent arrest.

### b. Single Criminal Objective: False imprisonment of a hostage and dissuading a witness

We come to a different conclusion with respect to the crimes of false imprisonment of a hostage as to Jesus and Lyubov (counts 7 and 11) and dissuading a witness as to those victims (counts 8 and 12).[10]

Section 210.5 defines false imprisonment of a hostage as false imprisonment "for purposes of protection from arrest . . . ." As relevant here, dissuading a witness is defined as preventing a victim or witness from reporting a crime. (§ 136.1, subds. (b)(1), (c)(1) [felony].) The only reasonable inference from the evidence is that defendant harbored a single criminal objective when he violated sections 136.1 and 210.5. That objective was to protect himself from arrest. One of the means he used to do so was to violate section 136.1 by preventing Jesus and Lyubov from reporting the criminal conduct they had

---

**9** Defendant was not convicted of dissuading a witness as to Alla; only assault with a firearm (count 12) and false imprisonment of a hostage (count 15).

**10** Part 3. b. applies only to Jesus and Lyubov. Because defendant was not convicted of dissuading a witness as to Alla our discussion in this section does not apply to her.

20

observed, and the other means was to keep the hostages in one location away from access to the police. Although the means were separate, the criminal objectives were the same.

In order to effect the application of section 654, we could either modify the sentence or remand for another sentencing hearing. In light of the trial court's careful and complex sentencing, it would be unwise for us to modify defendant's sentence on our own. "Courts view an aggregate prison term as one term made up of interdependent components. Thus, we cannot retain portions of the prior judgment; the invalidity of some of the components of [a defendant's] sentence requires us to remand for resentencing. [Citations.]" (*People v. Baylor* (1989) 207 Cal.App.3d 232, 237.) Instead we will remand to allow the trial court to conduct a new sentencing hearing which shall include the application of section 654 in the manner we have set forth. In applying section 654, the court shall identify the statute (either § 210.5 or § 136.1, subd. (c)(1)) that has the "longest potential term of imprisonment" (§ 654, subd. (a)), sentence on that statute, and stay the sentence on the other offense.

4.      Section 654 and the Enhancements

Although we chose not to modify the sentence, some of the issues raised by the parties bear further comment to the extent they may affect the trial court's sentence on remand.

The parties have addressed whether certain aspects of the sentence are unauthorized. An unauthorized sentence "is subject to being set aside judicially and is no bar to the imposition of a proper judgment thereafter, even though it is more severe than the original unauthorized pronouncement." (*People v. Serrato* (1973) 9 Cal.3d 753, 764, disapproved on another point in *People v. Fosselman* (1983) 33 Cal.3d 572, 583; *People v. Vizcarra* (2015) 236 Cal.App.4th 422, 433 [when the trial court imposes an unauthorized sentence, the People may raise the point for the first time on the defendant's appeal].)

First, the parties agree that, if sentence on a substantive offense is stayed pursuant to section 654, sentence on all enhancements relating to that offense must also be stayed. (*People v. Calles* (2012) 209 Cal.App.4th 1200, 1221 ["When the base term of a sentence

21

is stayed under section 654, the attendant enhancements must also be stayed. [Citation.]”].)  As the parties concede in their supplemental briefs, when the trial court on remand imposes a section 654 stay on either (1) the crimes of false imprisonment of a hostage as to Jesus and Lyubov (counts 7 and 11) or (2) dissuading a witness as to those victims (counts 8 and 12), the trial court shall also stay the enhancements that attach to the stayed counts.

Second, the parties agree that, if sentence on a substantive offense is not stayed pursuant to section 654, sentence on the firearm use enhancements relating to that offense should not be stayed.  As a general rule, enhancements are subject to section 654.[11] (*Ahmed, supra,* 53 Cal.4th at p. 163.)  But, there is a distinction between *multiple enhancements imposed on the same crime* and the *same enhancement imposed on multiple crimes*.  Where a single criminal act has resulted in convictions of multiple crimes that are separately punishable, section 654 does not bar multiple punishments for the same enhancement pled and proved as to each such crime.  (*People v. Wooten* (2013) 214 Cal.App.4th 121, 130-132.)  “Just as the use of a single gun against multiple victims admits separate sentences for an assault against each individual, so too separate enhancements—even under the same statute—may be imposed for each conviction arising out of a separate criminal act. [Citations.]  Conversely, a string of offenses against a single victim may yield multiple convictions of substantive offenses when each is committed for a different purpose. [Citation.]” (*Ibid*.)  By contrast, when multiple enhancements are pled and proved as to the *same crime*, section 654 bars multiple punishment of the *same aspect* of the criminal act (e.g., multiple gun use enhancements), but not for *different aspects* of the same criminal act (e.g. separate enhancements for gun use and infliction of great bodily injury).  (*Ahmed, supra*, 53 Cal.4th at pp. 163-164.)

---

**11**     Before applying section 654 to multiple enhancements, the trial court must look first to the relevant sentencing statutes.  If those statutes “provide the answer, the court should apply that answer and stop there.  Because specific statutes prevail over general statutes, consideration of the more general section 654 will be unnecessary.  Only if the specific statutes do not provide the answer should the court turn to section 654.” (*Ahmed, supra*, 53 Cal.4th at pp. 59-60.)

22

Here, defendant acknowledges that, if this court finds "separate objectives and indivisible acts" underlying the assault with a firearm convictions on the one hand, and the false imprisonment of a hostage and dissuading a witness convictions on the other hand, "failure to impose the enhancements was error." This is exactly the conclusion we have reached in section C.3. of our opinion. But we have come to a contrary conclusion as to the false imprisonment of a hostage convictions and the dissuading a witness convictions. Accordingly, the trial court shall stay the enhancement attendant to any count as to which it stays sentence on the substantive crime, and impose the enhancement on any sentence that is not stayed.

## DISPOSITON

The judgment is reversed as to the sentence only. In all other respects, the judgment is affirmed.


                              RUBIN, J.

WE CONCUR:


       BIGELOW, P. J.


       GRIMES, J.