Filed 9/22/25  P. v. Rubio CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B336583 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. XCNVA158478) |
| v. | |
| JUAN RUBIO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Roger Ito, Judge.  Affirmed.

Sandra Gillies, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Kenneth C. Byrne, Supervising Deputy Attorney General, Ana R. Duarte, Deputy Attorney General, for Plaintiff and Respondent.

————————————

Juan Rubio appeals from a judgment of conviction after a jury found him guilty of the first degree murder of his wife, Celina Rubio (Celina). The jury also found true the special allegation Rubio personally used a firearm during the commission of the murder. On appeal, Rubio contends the trial court abused its discretion by refusing to admit into evidence excerpts from Rubio's journal and admitting certain pages of Celina's journal. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *The Evidence at Trial*

1. *Events leading up to the shooting*

Rubio and Celina were married in 2005 and had one child together, Justin R., who was 15 years old at the time of the murder. Celina had an adult son from a prior relationship, Michael Martinez, and Rubio had an adult son from a prior relationship, Jonathan Rubio (Jonathan). In 2022, Rubio, Celina, Justin, and Martinez lived together in the family home.

Around 2020, problems developed in Rubio and Celina's marriage. In a journal entry dated July 12, 2020 Celia wrote she believed Rubio was an alcoholic and she did not trust him to take care of Justin. The couple fought often about finances and Rubio's failure to help around the house. Around this time Rubio and Celina began sleeping in separate rooms. Rubio slept in the primary bedroom and Celina slept in Justin's room. In 2021 Celina told Justin she wanted to divorce Rubio. Rubio mentioned to Jonathan that Celina wanted a divorce.

The issues in the marriage escalated in 2022 when Celina began dating a former coworker, Jose Casas. Rubio suspected that Celina was dating someone, and in February 2022 he placed

2

a tracker on her car.  Rubio showed Justin the tracker on his phone, and on several occasions Rubio told Justin that Celina was lying about her whereabouts because the tracker showed her car was not in the location she claimed.  Martinez saw Rubio looking underneath Celina's car three times in early 2022, and Martinez found the tracker under Celina's car after the killing.

Rubio also told Justin that on one occasion he went to the location where Celina's car was parked and waited in the parking lot for her to return.  A car appeared and dropped off Celina.  When Celina noticed Rubio, she asked what he was doing, and he said he was getting coffee and happened to see her car parked in the parking lot, so he waited for her.  In late March 2022 Rubio sent his brother pictures of Rubio's handwritten notes documenting times Celina had lied about where she was.

On February 22, 2022 Rubio texted Jonathan a picture of a letter from his bank dated February 7.  The letter was addressed to Rubio and stated the bank had received a "legal order" from an attorney requiring the bank to provide certain bank records.  The bank suggested Rubio contact a lawyer if he wanted to take legal action with respect to the request.  Rubio told Jonathan that Celina had Jonathan's social security number, so Jonathan should withdraw money from the bank, for example $50,000, "just in case."  Jonathan responded, "She's not divorcing me.  I have nothing to worry about."

The next day Rubio sent a text message to a friend stating, "Need a real one a gun."  On March 11, 2022 Rubio sent several text messages to another friend asking the friend to purchase a gun and send it to Rubio.  Over the next few days Rubio exchanged text messages with a friend regarding purchase of a gun at a gun show or a pawn shop.  On March 17 Rubio texted a

friend a picture of a gun permit with Rubio's name on it. Rubio texted the same friend several times between March 21 and April 1 asking what type of ammunition to buy and where to buy it.

Justin recounted an incident when Celina told him she had seen Rubio putting something in her coffee. Rubio told Justin and Celina that it was just water. Rubio asked Celina, "Do you really think I would hurt the mother of my kids?" Celina replied, "I don't know." The prosecution also introduced a copy of a text message dated March 30, 2022 from Celina to a friend in which Celina stated, "I caught him on Friday putting something in my coffee . . . ." On March 31 Rubio sent his brother pictures of Celina's journal in which Celina recounted the coffee incident.

On April 18 Rubio sent his brother a picture of an undated entry from Rubio's journal that read, "I really hope I fuck up your plans you had after that I'm gone and your future you had with the guy. You were planning to have him move in to this house." Also introduced into evidence was another undated journal entry written by Rubio that stated, "Celina and Zinnia [Rubio's niece] I hope with this you [two] have a lot to talk about for the rest of your life."

On May 26, 2022 Rubio was served with a petition for dissolution of marriage.

2. *The murder*

On the evening of May 29, 2022 Celina and Casas went to a movie. After she returned home, Celina texted Casas around 10:30 p.m. that Rubio had prevented her from getting her belongings. Celina's texts stated, "I need to have access to my stuff," and "Either he unlocks it or I call the cops." Around 10:40

p.m. Celina and Casas exchanged messages saying "Good Night" and using "kissy emoji faces."

Justin was in his bedroom when Celina came home from the movie. When she got home, she went into Justin's room to say good night. A few minutes later Justin heard Celina in the hallway saying, "What the hell are you doing? Get the hell out of my face." Justin then heard gunshots and Celina calling his name and screaming for him to call the police. Justin stayed in his room and called Jonathan, then the police. Justin heard a total of five gunshots—two quickly, then a pause followed by two more gunshots followed by another pause, and the final gunshot occurred while Justin was on the phone with Jonathan. The transcript of Justin's call to emergency services showed the call was made at 10:53 p.m.

The Rubios' home had a motion activated security camera located outside the front door, facing the street. The camera began recording when the motion sensor was activated, for example, when a car drove by the house, and the camera would stop recording when the motion ceased. The prosecutor played a video for the jury that was taken by the security camera at the time of the murder. The timestamp on the video was 10:50 p.m. According to the prosecutor's description of the video, which Rubio does not dispute, six seconds after the video begins two gunshots can be heard, one at the six-second mark and one at the eight-second mark. Celina can then be heard calling Justin's name three times. The video continues for seven seconds before ending.

Celina was shot a total of four times: in the right arm, left thigh, left shoulder, and left lower chest. She was found seated on the floor of the kitchen with her head slumped down toward

5

her knees and was pronounced dead at the scene.  Rubio was found on the floor near Celina with a gunshot wound under his chin.  Doctors later determined Rubio had a bullet lodged in his forehead.  The treating physician testified Rubio had likely shot himself under the jaw, the bullet travelled upward through his jaw and nose, and then lodged in his forehead.[1]

3.     *The crime scene investigation and autopsy*

The police officers processing the crime scene found two bullets on the floor near Celina and a bullet hole in the hallway wall approximately 45 inches high.  Celina's phone was on the floor in the hallway.

The medical examiner who performed the autopsy on Celina testified regarding her injuries.  As noted, Celina was shot four times.  Her right arm had an entrance wound on the front of the arm with an exit wound on her rear right shoulder.  The bullet was fired at close range, likely within two feet.  The gunshot to Celina's thigh was also fired from the front with an exit wound on the back of the thigh.  The bullet that passed through Celina's left shoulder entered at the top of the shoulder with an exit wound in her armpit.  If she had been standing or sitting upright, the bullet would have traveled downward from the top of the shoulder through the armpit.  If Celina had been seated and slumped forward, the gun would have needed to be held parallel to the floor to achieve that trajectory.  None of these wounds was life-threatening.

The fatal gunshot was fired from within two feet, and the bullet entered Celina's left lower chest.  The bullet went through

---

[1]     Rubio did not testify at trial.

6

her heart and lung before lodging in her back. This wound was immediately life-threatening, and it was unlikely Celina would have been able to call out to Justin after sustaining this injury. Given the nature of the entrance wound and trajectory of the bullet, the medical examiner concluded Celina was seated and/or hunched forward when the fatal shot was fired.

B.     *Jury Instructions and Closing Argument*

The trial court instructed the jury with CALCRIM No. 521 on first degree murder and CALCRIM No. 570 on voluntary manslaughter based on killing in the heat of passion.

CALCRIM NO. 521 provides, as read to the jury, "The defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately, and with premeditation. . . .  The defendant acted deliberately if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. The defendant acted with premeditation if he decided to kill before completing the act that caused death. [¶] The length of time the person spends considering whether to kill does not alone determine whether the killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from person to person according to the circumstances. A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated. On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection not the length of time."

CALCRIM No. 570 provides in part, as given to the jury, "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion. [¶] The defendant

7

killed someone because of a sudden quarrel or in the heat of passion if: [¶] 1. The defendant was provoked; [¶] 2. As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment; AND [¶] 3. The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment. [¶] . . . [¶] [T]he defendant must have acted under the direct and immediate influence of provocation. . . ."

During her closing argument, the prosecutor argued Rubio acted with deliberation and premeditation. The prosecutor's theory was that on the night of May 29, Rubio confronted Celina in the hallway with his gun. The first two shots were fired in the hallway and hit Celina in the right arm and thigh. The wounds from those shots were consistent with Celina standing up, and the bullet hole in the wall was consistent with the trajectory of the bullet that went through her arm. These must have been the two shots heard on the security camera audio because once Celina was shot in the chest, she would not have been able to scream for Justin. After the first two shots, Celina dropped her phone in the hallway, where it was later found, walked to the kitchen, and sat down on the floor. Rubio followed her to the kitchen and shot her in the shoulder and chest while she was seated on the floor.

The prosecutor noted that in the security footage audio, seven seconds elapsed between the second gunshot and the end of the recording, during which Celina could be heard calling Justin's name. Because Celina yelled for Justin to call the police after the first two gunshots were fired, and Celina's plea to call the police was not heard on the recording, there must have been *at least*

seven seconds between the second shot and the third shot. Thus, the more than seven seconds between the second and third gunshots were sufficient for Rubio to have reflected and made the decision to kill Celina. The prosecutor argued, "We don't know when the defendant first formed the intent to kill Celina, but we don't need to know when he first formed the intent. We don't know if it was when he got the letter from [the bank]. We don't know if it was when he first decided that he needed to buy a gun. We don't know if it was when he put the tracker on her car and started following her. . . . And you know what, it's not even necessary that he premeditated to kill with that first shot that he took or the second shot he took. There is no doubt that the defendant intended to kill Celina with deliberation and premeditation when he shot her in the heart, and that is the only question in this case."

During his closing argument, defense counsel stated the only issue in the case was Rubio's mental state at the time of the murder and whether he acted deliberately with premeditation or rashly in the heat of passion. The defense theory was that Rubio was provoked by the messages with "kissy face emojis" exchanged between Celina and Casas shortly before the killing. The messages "caused [Rubio] to act so rashly without due deliberation." Defense counsel argued it was unreasonable to conclude Rubio had a plan to kill Celina because "there [are] at least three months where he could have done it; right? Buys the gun in March. He's tracking her. . . . If he really wanted to premeditate, deliberate, and first degree murder kill her, there were so many chances that he could have done it. What are the odds that the time he does it is within minutes of her receiving [a message] from her lover?"

In addition, defense counsel cited two of Rubio's journal entries to bolster the argument Rubio had not planned to kill Celina. He discussed the journal entry where Rubio wrote he hoped Celina and his niece had a lot to talk about "for the rest of your life" and the entry in which Rubio wrote he hoped to "fuck up" Celina's plans with Casas for after Rubio was gone. These entries, defense counsel argued, showed that Rubio contemplated Celina would still be alive after he had committed suicide: "The plan was not to kill [Celina]. . . . [Rubio's] intention was to kill himself until that triggering event, until that provoking event, when his confirmation was received of the affair, and then he lost it."

C.     *The Verdict and Sentencing*

The jury found Rubio guilty of first degree murder (Pen. Code, § 187, subd. (a)) and found true the allegation Rubio personally used a firearm within the meaning of Penal Code section 12022.5, subdivision (a). After considering applicable mitigating and aggravating factors, the trial court sentenced Rubio to an aggregate term of 35 years to life, consisting of an indeterminate term of 25 years to life for first degree murder, plus a consecutive determinate term of 10 years (the upper term) for the firearm enhancement.

Rubio timely appealed.

## DISCUSSION

A.     *The Challenged Evidentiary Rulings*

On appeal, Rubio argues the trial court improperly excluded from evidence two entries from Rubio's journal and improperly admitted an entry from Celina's journal. The first

10

entry from Rubio's journal consists of two undated handwritten pages titled, "Me Juan Rubio, my will to Jonathan Justin Rubio." The entry explained how Rubio wanted his belongings to be distributed after his death, including that Celina could give his wedding ring to Martinez. The entry also stated Rubio did not want Celina to manage his money and he did not "want Celina screwing over my son Jonathan." Defense counsel represented the entries were written around March 22, 2022.

The prosecutor objected to admission of the will on hearsay grounds. Defense counsel argued the will was a "nonhearsay legal act" and was admissible pursuant to Evidence Code section 1330, which states evidence contained in a will is not made inadmissible by the hearsay rule if certain conditions are met, including that the "matter stated would be relevant to an issue as to an interest in the property." (Evid. Code, § 1330, subd. (b).) The court sustained the objection to the will, finding the exception was intended to allow admission of a will for purposes of determining ownership and conveyances of real and personal property, and not "assertions" made in the will for other purposes.

The second entry in Rubio's journal was an undated handwritten entry in which Rubio wrote, "Celina I hope you keep on dancing in the kitchen to your music and please don't stop whistling all over the house. . . ." Defense counsel argued this journal entry and the will were admissible pursuant to the rule of completeness under Evidence Code section 356, which provides: "Where part of [a] writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party[,] . . . and when a detached . . . writing is given in evidence, any other . . . writing which is necessary to make it understood

11

may also be given in evidence." Defense counsel argued that because the prosecution was permitted to submit some of Rubio's journal entries into evidence, Rubio was entitled to submit other entries for completeness. Defense counsel argued the proffered journal entries contradicted the prosecutor's premeditation theory because "Celina Rubio is mentioned as being alive" in them (and therefore Rubio did not intend to kill her at that point).

The court found Rubio's journal entries were not admissible under Evidence Code section 356 because the proffered entries did not "relate[] to the same concept or idea" as the admitted entries. Nor were the admitted journal entries "confusing for the jury" such that additional material was necessary for the jury to understand them.

Finally, the entry from Celina's journal that Rubio argues was improperly admitted was the one in which Celina described Rubio putting something in her coffee. Defense counsel objected to the journal entry as hearsay. The prosecutor argued Rubio had taken a picture of the journal entry and texted it to his brother, making the entry admissible to show its effect on the viewer. The trial court overruled the objection.

B.      *Standard of Review*

We review a trial court's ruling on evidentiary issues, including hearsay objections, for abuse of discretion. (*People v. Waidla* (2000) 22 Cal.4th 690, 725 ["an appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence, including one that turns on the hearsay nature of the evidence in question"]; *People v. Yates* (2018) 25 Cal.App.5th 474, 484-485 [same].)

We will not reverse a judgment for the improper admission or exclusion of evidence in violation of state statutory law unless it is reasonably probable that a result more favorable to the defendant would have been reached in the absence of the error, as articulated in *People v. Watson* (1956) 46 Cal.2d 818.  (*People v. Valencia* (2021) 11 Cal.5th 818, 840; see *People v. Arias* (1996) 13 Cal.4th 92, 157 [error in excluding evidence under Evid. Code, § 356 evaluated under standard of prejudice for state law error under *Watson*]; *People v. Landau* (2016) 246 Cal.App.4th 850, 866 ["As a general rule, the erroneous admission of hearsay evidence will not result in a reversal unless it is reasonably probable the defendant would have received a more favorable result had the evidence not been admitted."].)[2]

_____

[2]    We reject Rubio's contention we must assess any error under the federal constitutional standard of *Chapman v. California* (1967) 386 U.S. 18 at page 24, which requires any error be harmless beyond a reasonable doubt.  Rubio's argument that admission of Celina's journal entry violated his right to confrontation fails because he has not shown Celina's statements in the entry were testimonial under *Crawford v. Washington* (2004) 541 U.S. 36, 68-69, which requires that "the statement must have been given and taken primarily for the purpose ascribed to testimony—to establish or prove some past fact for possible use in a criminal trial."  (*People v. Cage* (2007) 40 Cal.4th 965, 984, italics omitted; see *People v. Lopez* (2013) 56 Cal.4th 1028, 1065-1066 [murder victim's "recording of the day's events in her private diary . . . fall outside the scope of the confrontation clause, which is concerned with 'formal and solemn accusatory statements . . . in the context of criminal investigations or inquiries'"].)

Nor has Rubio shown any error deprived him of due process by preventing him from providing a defense and rendering his

13

C.    *Any Error in the Trial Court's Evidentiary Rulings Was Harmless*

Even if the trial court abused its discretion in making some or all of the evidentiary rulings excluding the two entries in Rubio's journal and admitting Celina's journal entry, the errors were harmless.  In order to prove first degree murder, the prosecution was required to show the murder "'occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse.'  [Citation.]  The reflection may be arrived at quickly; it need not span a specific or extended period of time."  (*People v. Lopez* (2018) 5 Cal.5th 339, 354-355; see *People v. Gomez* (2018) 6 Cal.5th 243, 282 ["''''The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly'''''"]; CALCRIM No. 521.)

The prosecutor argued Rubio could have decided to kill Celina as early as February 2022 when he received the letter from the bank, or over the next few months during which he sought and purchased a gun and ammunition.  However, the prosecutor also argued Rubio made the decision to kill Celina on the night of the murder.  The evidence to support the latter

trial fundamentally unfair.  (See *People v. Partida* (2005) 37 Cal.4th 428, 439 ["[a]bsent fundamental unfairness, state law error in admitting evidence is subject to the traditional *Watson* test"]; *People v. Dryden* (2021) 60 Cal.App.5th 1007, 1025-1026 ["For the erroneous admission of evidence to amount to a denial of due process, the evidence must have been "'sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it.'''"].)

14

theory was compelling, and the evidence Rubio now argues was improperly admitted or excluded would have had minimal, if any, relevance to Rubio's state of mind that night. And the evidence Rubio focuses on regarding Rubio's intent during the months leading to the killing was duplicative of other evidence.

The jury heard evidence that Rubio initiated a confrontation with Celina on the night of the murder by approaching her in the hallway with a gun and, after she asked him what he was doing and told him to get away from her, he shot her twice. Her body was found in a seated position in the kitchen, showing she must have been followed by Rubio as she moved from the hallway to the kitchen, while she screamed for Justin to call the police. Only then, at least seven seconds after the second gunshot, did Rubio shoot Celina in the chest from less than two feet away. As the autopsy showed, it was the gunshot wound to the left chest that caused Celina's death. This provided ample evidence from which the jury could have reasonably concluded Rubio made the deliberate decision to murder Celina on the night of the murder, regardless of whether he had previously planned to kill her. (See *People v. San Nicolas* (2004) 34 Cal.4th 614, 658 ["Defendant stated that he saw April's reflection in the bathroom mirror before turning around and stabbing her. . . . This brief period between seeing April's reflection and stabbing her is adequate for defendant to have reached the deliberate and premeditated decision to kill April."]; *People v. Vorise* (1999) 72 Cal.App.4th 312, 319 [after defendant and victim had a brief argument, "firing of his gun twice at close range into the chest of an incapacitated victim supports a finding Vorise made a cold, calculated decision to kill the victim"].)

15

With respect to Rubio's state of mind in the months leading up to the murder, Rubio argues the exclusion of his journal entries was prejudicial because the entries demonstrated "Rubio's understanding he would be dead and Celina would be alive, something that undercut the prosecution's theory of months of planning and suggested some sort of provocation on May 29." This argument is unavailing. There was other evidence admitted at trial that contained similar statements from which the jury could have concluded Rubio believed Celina would outlive him. For example, the trial court admitted Rubio's journal entry that said with respect to Celina's future life with Casas, "I really hope I fuck up your plans you had after that I'm gone" and another entry in which Rubio said he hoped Celina and Rubio's niece would "have a lot to talk about for the rest of your life." Based on that evidence, defense counsel argued to the jury that Rubio had intended to kill only himself until being provoked the night of the murder. It is not reasonably probable that two additional journal entries expressing similar sentiments would have resulted in the jury reaching a different conclusion regarding Rubio's state of mind on the night of the murder.

Further, Rubio's argument that he was provoked into killing Celine in the heat of passion after seeing the affectionate text messages between Celina and Casas is based on speculation—there was no evidence Rubio saw those messages. Moreover, admission of additional journal entries showing that in the months before the killing Rubio expected Celina to outlive him would not have bolstered his argument that on the night of the killing he acted in the heat of passion.

The same analysis applies to Rubio's argument that the trial court abused its discretion in admitting Celina's journal

16

entry recounting how Rubio tampered with her coffee. The jury heard evidence of that incident through Celina's March 30 text message to a friend stating she caught Rubio tampering with her coffee and Justin's testimony that Celina told him about the tampering incident. Additional corroboration of that event is not reasonably likely to have influenced the jury's view of Rubio's state of mind on the night of the murder.

In light of the compelling evidence that Rubio had time to deliberate on the night of the killing and the lack of evidence of provocation on that night, it is not reasonably probable the exclusion of Rubio's journals and the admission of Celina's journal would have changed the outcome at trial.[3]

## DISPOSITION

The judgment is affirmed.


FEUER, J.

We concur:


MARTINEZ, P. J.        STONE, J.

---

[3] Because we find any error was harmless, we do not reach the Attorney General's argument that Rubio forfeited some of his arguments. Nor do we address Rubio's contention that, if forfeited, he received ineffective assistance of counsel.